UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

━━━━━━━━━━━━━━

No. 11-4888
(1:10-cr-00317-GBL-1)

━━━━━━━━━━━━━━

UNITED STATES OF AMERICA,

            Plaintiff – Appellee,

      v.

DONALD CONE,

            Defendant – Appellant,

      and

CHUN-HUI ZHAO; RICHARD J. NELSON, Cisco Systems, Inc.,

            Parties-In-Interest.

━━━━━━━━━━━━━━━━

No. 11-4934
(1:10-cr-00317-GBL-1)

━━━━━━━━━━━━━━

UNITED STATES OF AMERICA,

            Plaintiff – Appellee,

      v.

CHUN-YU ZHAO, a/k/a Jessica Smith, a/k/a Chun Yu Zhao,

            Defendant – Appellant.

O R D E R

The Court amends its opinion filed April 15, 2013, as follows:

On page 6, second full paragraph, line 2 –– the word "left" is substituted for the word "fled."

On page 40, first full paragraph, line 6 –– the word "not" preceding the word "manufactured" is deleted.

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

    *Plaintiff - Appellee,*

v.

DONALD CONE,

    *Defendant-Appellant,*

    and

CHUN-HUI ZHAO; RICHARD J.
NELSON, Cisco Systems, Inc.,

    *Parties-In-Interest.*

No. 11-4888

UNITED STATES OF AMERICA,

    *Plaintiff - Appellee,*

v.

CHUN-YU ZHAO, a/k/a Jessica
Smith, a/k/a Chun Yu Zhao,

    *Defendant-Appellant.*

No. 11-4934

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(1:10-cr-00317-GBL-1)

Argued: October 26, 2012

Decided: April 15, 2013

Before AGEE, WYNN, and FLOYD, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion. Judge Agee wrote the majority opinion, in which Judge Floyd joined. Judge Wynn wrote an opinion concurring in part and dissenting in part.

---

**COUNSEL**

**ARGUED:** Lisa Hertzer Schertler, SCHERTLER & ONORATO, LLP, Washington, D.C., for Appellants. Lindsay Androski Kelly, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Justin A. Torres, GIBSON, DUNN & CRUTCHER, LLP, Washington, D.C.; Geremy C. Kamens, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant Donald Cone. Neil H. MacBride, United States Attorney, Jay V. Prabhu, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

**OPINION**

AGEE, Circuit Judge:

Donald Cone and Chun-Yu Zhao were convicted of various charges under an indictment arising out of a scheme to import and resell counterfeit pieces of computer networking equipment, some of which bore the trademark of Cisco Systems, Inc. ("Cisco"). On appeal, they challenge certain evidentiary rulings made at their joint trial and whether some of the criminal acts alleged can support a conviction for criminal counterfeiting under 18 U.S.C. § 2320. Additionally, Cone challenges

whether sufficient evidence supports his conviction for conspiracy and Zhao challenges the sufficiency of the evidence on certain substantive counts upon which she was convicted. For the reasons set forth below, we reject Zhao and Cone's attack on the district court's evidentiary rulings and Cone's argument that his conviction was not supported by sufficient evidence. However, the government's theory of prosecution based on a "material alteration" theory of counterfeiting trademarks is not cognizable under the criminal counterfeiting statute based on the facts of this case. Further, the government's evidence on Count 10 was insufficient as a matter of law to sustain Zhao's conviction. We therefore vacate the judgment of the district court on certain counts of conviction, affirm the judgment of the district court in all other respects, and remand for resentencing.

I.

Background and Material Proceedings Below

A.   The Factual Background

Zhao, then a recent immigrant from the People's Republic of China ("China"), was recently divorced from Junling Yang, an indicted co-conspirator in this case who remains at large, when she married Cone.[1] While living and working in the United States, Zhao and Cone formed JDC Networking, Inc. ("JDC"), a licensed distributor of products made by and for Cisco. JDC conducted frequent business with a company known as Han Tong Technology ("Han Tong"), a Hong Kong-based business alleged to be operated by members of Zhao's family. As a Cisco "registered partner," JDC was contractually prohibited from purchasing Cisco products for resale from outside of the United States, yet records intro-

---

[1]Based on the jury's verdict, we recite the facts in the light most favorable to the government. *United States v. Cloud*, 680 F.3d 396, 399 n.1 (4th Cir. 2012).

duced at trial reflect that, from 2004 through 2010, JDC imported over 200 shipments from Han Tong and companies associated with Han Tong in China containing both genuine Cisco products and fake imitations.

In 2005 and 2006, while Zhao and Cone were living together in Rockville, Maryland, U.S. Customs and Border Patrol ("CBP") agents began intercepting and seizing shipments of highly sophisticated counterfeit computer networking products sent from Han Tong to "Lucy" and "Donald," at addresses in Rockville, Maryland. The investigation went cold, however, when the shipper of the counterfeit goods began declaring a very low value for the goods shipped and using variant spellings of the destination address, thus foiling CBP's tracking techniques.

From 2004 to 2010, JDC marketed computer equipment bearing a Cisco mark to consumers and resale outlets. Several of JDC's customers, however, were dissatisfied with some of the products they purchased from JDC. E-mails introduced at trial from JDC customers revealed that some clients believed they had been sold counterfeit or fake products.

Zhao filed income tax returns indicating that JDC was struggling and that she was only earning a small salary. In fact, JDC was thriving and producing significant income for her. JDC records reflect that it was purchasing Cisco products (or purported Cisco products) in China for resale at considerably below the expected market price for such products and then reselling the products with a high markup.

As JDC thrived, however, Zhao's marriage to Cone deteriorated. In late 2007, Cone moved out of the couple's home, and Zhao moved into a condominium with her ex-husband Yang. Upset with Zhao over their faltering marriage, Cone sent Zhao a series of e-mails demanding his share of JDC proceeds. In one, he stated "I won't let my life get ruined. I will make sure everyone knows the truth about everything. IRS, DOJ, Cus-

toms, Immigration, et cetera. . . . I have proof of everything." (J.A. 1651.) In another e-mail, Cone indicated that "other companies were returning products to us because they were counterfeit." (J.A. 1653.) Zhao and Cone later divorced.

In 2010, CBP was notified that four pieces of "highly sophisticated, very expensive" counterfeit networking tech- nology ("routers") bearing Cisco marks were seized upon entry from China into the United States, bound for a Parcel Plus retail storefront in Northern Virginia and with an esti- mated value of thousands of dollars per piece of equipment. CBP agents compared the attributes of this shipment with those in the 2005-06 investigation and concluded that the 2010 shipments were similar and likely related to the same counterfeiting scheme.

Coordinating its efforts with DHL (a shipping company) and Immigration and Customs Enforcement ("ICE"), CBP intercepted the next package sent from China to the address in Virginia. When CBP and ICE agents opened the package, they discovered over 300 labels bearing a Cisco mark that agents suspected to be counterfeit. CBP and ICE forwarded the package to an ICE facility in Washington, where agents coordinated a controlled delivery of the package to the Parcel Plus retail storefront. Agents observed Zhao retrieving the package and followed her to her home. CBP and ICE agents then executed an anticipatory search warrant at the residence.

In the course of searching Zhao's home, federal agents dis- covered, in addition to the shipment of suspected counterfeit Cisco labels that led them to Zhao, unlabeled transceivers that matched the labels found in the shipment, labeled transceiv- ers, business and financial records, torn labels and label back- ing, and instructions on how to convert Cisco equipment into different models.

As investigators were executing the search warrant at Zhao's home, a FedEx delivery driver attempted to deliver

two packages to her. The delivery driver revealed to the agents executing the warrant that Zhao maintained a storage unit across the street. Although Zhao initially denied the existence of the storage unit (and later provided law enforcement agents with a false unit number and a false entry code to the storage facility), agents were eventually able to gain access. Agents found quantities of boxes filled with equipment bearing a Cisco mark filling "at least half" the storage unit. (J.A. 614.)

After being arrested, Zhao was interviewed by ICE Agent Julie Hilario for approximately 45 minutes. Although Zhao initially denied any involvement with counterfeiting (and even denied receiving the package that was the subject of the controlled delivery), she eventually admitted that she sold "fake" Cisco products to make a greater profit than with a legitimate product.

As ICE and CBP pursued the investigation, agents interviewed Cone by telephone (he had left the United States and was living in China). Cone admitted that JDC received and resold both real and counterfeit Cisco products from Han Tong (which he described as a "fake" company). (Vol. V J.A. 1990.) With respect to "authentic" Cisco products, Cone informed agents that he and Zhao altered authentic Cisco products obtained from China and sold them to clients, representing that they were higher end products than they actually were. Cone was later arrested when he returned from China in December 2010.

## B.  District Court Proceedings

Cone and Zhao were both indicted by a grand jury (along with Yang and Chun-Yan Zhao, defendant Zhao's sister) in 2010 in the United States District Court for the Eastern District of Virginia on one count of conspiracy in violation of 18 U.S.C. § 371, with three objects: (1) trafficking in counterfeit goods and labels; (2) importation and sale of improperly

declared goods; and (3) wire fraud (Count 1); and three counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts 16-17, 23).[2]

As relevant to that part of the Count 1 conspiracy charge alleging trafficking in counterfeit goods and labels, the government presented at trial three theories underlying the alleged objects of that conspiracy. First, that some of the products seized from Zhao's residence or sold to end-users were represented to be Cisco products but in fact were "pure" counterfeits (i.e., the products were never made by or for Cisco). Second, other products (acquired from legitimate Cisco resellers in the United States and abroad) were indeed made by or for Cisco, but were converted by Zhao and Cone into a different type of Cisco product and represented to buyers as the original of that item (the "material alteration" theory). Third, other products acquired from China that were originally made by or for Cisco but were relabeled and mislabeled by Zhao and Cone with new serial numbers to deceive customers into believing that the products were eligible for Cisco warranty and services in the United States, when, in fact, such products were not so eligible.[3]

---

[2]In addition, Zhao was individually indicted on five counts of importation and sale of improperly declared goods in violation of 18 U.S.C. § 545 (Counts 2-6); four counts of trafficking in counterfeit goods and labels in violation of 18 U.S.C. § 2320 (Counts 7-10); three counts of making false statements to federal law enforcement officials in violation of 18 U.S.C. § 1001(a)(2) (Counts 11-13); two counts of false statements in naturalization in violation of 18 U.S.C. § 1425(a) (Counts 14-15); seven individual counts of wire fraud (Counts 18-2, 24-25); three counts of money laundering in violation of 18 U.S.C. § 1956(a) (Count 26-28); and one count of monetary transaction with criminally derived proceeds in violation of 18 U.S.C. § 1957(a) (Count 29).

[3]For purposes of this appeal, only Counts 1 and 9 are affected by the second object of the conspiracy, which we address as the material alteration theory. The first and third objects are not at issue on appeal as part of the material alteration theory challenge. The convictions related to the first object, importation of misdeclared goods (and underlying substantive counts) are unaffected by our analysis of the material alteration theory, and the third object, wire fraud, was dismissed by the district court.

In support of Count 8 (counterfeiting) the government introduced testimony from its expert, Cisco engineer Michael Heidecker, who testified that the four routers seized by CBP in 2010 each contained a unique Cisco "MAC address," but that the MAC addresses found on the routers were actually assigned to other Cisco products. Thus, Heidecker was able to establish that the four routers were not actually manufactured by Cisco. Furthermore, they were shipped in packaging that, although displaying a Cisco mark, was, according to Heidecker, counterfeit. Defense expert Richard Krebs, however, opined that the routers were manufactured by or for Cisco, because the MAC addresses for each were actually consistent with the MAC addresses assigned to Cisco and because counterfeiters could not have created the switches due to the prohibitive cost.

Craig Grant, a manager at Vology, a Cisco equipment reseller, testified regarding Cisco-marked transceivers that are the subject of Count 10 (counterfeiting). Grant testified that Vology purchased ten Cisco transceivers from JDC, but returned them to JDC because Vology was unable to verify the transceivers' authenticity. Specifically, Grant stated that the Vology inventory team noted that the transceivers were not packaged in standard Cisco packaging. The exact items JDC sold to Vology were not available at trial (having been returned to JDC and resold). Heidecker told the jury that Cisco does not sell unlabeled transceivers and packages them in a certain specific manner not followed in the case of Vology.

During the government's case in chief, Zhao lodged timely objections to several items of evidence. First, Zhao moved to exclude statements made by Cone which she argued incriminated her and therefore required exclusion under *Bruton v. United States*, 391 U.S. 123 (1968) (holding that admission of a statement inculpating a co-defendant in a joint trial violates the co-defendant's rights under the Confrontation Clause). The district court denied the motion, although it did require

the government to excise any mention of Zhao's name when Cone's statements were presented to the jury and replace her name with a gender-neutral noun. The court reasoned that "there are multiple individuals involved [in the conspiracy]" and therefore, Zhao's rights under the Confrontation Clause would not be prejudiced by use of a gender-neutral substitute. Accordingly, when Cone's statements were read into evidence, "another individual" was substituted for Zhao's name.

Zhao also filed a motion in limine to exclude e-mails from JDC customers characterizing certain Cisco products purchased from JDC as "fake" or "counterfeit." She argued that the e-mails constituted inadmissible hearsay. The district court denied the motion on the grounds that the e-mails were to be admitted not for their truth, but rather, as evidence that Zhao and Cone were on notice that the products JDC sold were not authentic. After the e-mails were introduced at trial, Zhao requested a limiting instruction from the court that the e-mail statements were not to be considered by the jury for their truth. The court replied as follows but did not give the requested limiting instruction.

> I believe I've said that multiple times to the jury. I'll say it again. The jury is going to decide what is counterfeit or not. They make up the definition. The e-mails say what they say, and the jury will have to decide if they're believable or not. That's their job.

(J.A. 1673-74.)

At the close of the evidence, Cone moved pursuant to Federal Rule of Criminal Procedure 29 for judgment of acquittal on the charges against him. The district court granted the motion with respect to the wire fraud counts (16-17, 23), granted it in part to the extent that Count 1 (conspiracy) related to wire fraud, but denied the motion for the remainder of Count 1 charging a counterfeiting and importation of misdeclared goods conspiracy.

Zhao similarly filed a Rule 29 motion as to all of the wire fraud counts, as well as a motion to dismiss Counts 1 through 6 (the conspiracy charge and the improperly declared goods charges). The district court granted the motion with respect to the wire fraud charges and denied it in all other respects.[4]

In denying the Rule 29 motions on the remaining counts, the district court briefly discussed Cone and Zhao's argument that the government's "material alteration" theory exceeded the scope of the federal criminal counterfeiting statute. The court reasoned:

> the issue of whether the marks appear on the serial numbers and the various labels including barcodes are encompassed in the definition [of spurious mark] because labels are being applied to Cisco products to give the end[ ]user an impression that the goods that were of a higher grade than when they originated from the factory. . . .

> The statute has to be interpreted in the light of the meaning, and the presentation of an item as new when it has been altered under a mark is likely to cause confusion and lead the consumer to believe the product was made by the genuine owner of the trademark in the fashion in which it left the factory even though it was not.

(J.A. 2344.)

The jury returned a mixed verdict, convicting Cone of conspiracy (the only remaining charge against him), convicting Zhao of conspiracy, all four improperly declared goods charges, all four trafficking in counterfeit goods and labels charges, two counts of money laundering, one count of mak-

---

[4]The district court also dismissed Count 15, false statements in naturalization, on the government's motion.

ing a monetary transaction with criminally derived proceeds, and three charges not relevant to this appeal. Zhao was acquitted on one false statement to law enforcement charge and one money laundering charge.

The district court imposed a thirty-month sentence upon Cone and a sixty-month sentence upon Zhao. Both noted timely appeals and we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

### A. Counterfeiting Charges

#### 1. "Material Alteration" as Counterfeiting a Mark Under 18 U.S.C. § 2320

Zhao and Cone raise a pointed challenge on appeal to their convictions under Count 1 (conspiracy to counterfeit) and by Zhao on the underlying substantive counterfeit charge in Count 9. Their argument is that material alteration, one of the government's theories of criminal liability under the federal criminal counterfeiting statute, 18 U.S.C. § 2320 (2011, West 2012)[5] is not a crime as defined by that statute.

We emphasize at the outset of our analysis, as we noted earlier, that the government alleged several distinct activities as separate acts of counterfeiting (and similarly types of conspiracies to counterfeit). In Count 7, for example, the government alleged that the Cisco labels found in Zhao's home and storage locker were completely fake, that is, never manufactured by or for Cisco resulting in "pure" counterfeit labels. As we explain below, that act of counterfeiting is plainly cognizable as violating § 2320. What Zhao and Cone challenge is

---

[5]Section 2320 has been amended in 2011 and 2012. We cite to the prior version of the statute which was the version in effect during all times relevant to this appeal.

the government's theory of prosecution for "material alter-ation" counterfeiting. That is, the government contends § 2320 counterfeiting of marks includes transactions in which a good bears a genuine and authentic mark, but is altered to be a different product than the one to which the mark was originally fixed. Cone and Zhao not surprisingly disagree with the government and argue that "the [criminal counterfeiting] statute eliminates from the universe of 'counterfeit marks' any mark that was placed on a good by its authorized manufac-turer and confirms that goods that have been marked in that fashion are not 'counterfeit.'" Opening Br. of Appellants at 25.[6] As the statute is written, we conclude that Cone and Zhao have the better argument.

Where, as here, we are asked to interpret the language of a criminal statute, we are guided by the relevant canons of construction.

> "The starting point for any issue of statutory inter-pretation . . . is the language of the statute itself." "In that regard, we must first determine whether the lan-guage at issue has a plain and unambiguous meaning with regard to the particular dispute . . . and our inquiry must cease if the statutory language is unam-biguous and the statutory scheme is coherent and consistent." "We determine the 'plainness or ambiguity of statutory language . . . by reference to the language itself, the specific context in which that language is used, and the broader context of the stat-ute as a whole.'"

*Ignacio v. United States*, 674 F.3d 252, 254 (4th Cir. 2012)

---

[6]Zhao and Cone argue, in the alternative, that § 2320 would be uncon-stitutionally vague if applied to them in the context of material alteration counterfeiting. Because we agree that the material alteration theory of criminal counterfeit lacks statutory foundation, we do not address their alternative vagueness argument.

(citations omitted). In interpreting a criminal statute, we must be certain that its language clearly identifies the act which is rendered a trespass of the law. "[I]n the interest of providing fair warning of what the law intends to do if a certain line is passed, we will construe . . . criminal statute[s] strictly and avoid interpretations not clearly warranted by the text." *WEC Carolina Energy Solutions LLC v. Miller*, 687 F.3d 199, 204 (4th Cir. 2012) (internal quotation marks and citations omitted).

We look first, therefore, to the plain language of the statute. Under § 2320(a) the act made a crime is defined, in relevant part, as "intentionally traffic[king] or attempt[ing] to traffic in goods or services and knowingly us[ing] a counterfeit mark on or in connection with such goods or services" and "intentionally traffic[king] or attempt[ing] to traffic in labels, . . . boxes, containers, . . . or packaging of any type or nature, knowing that a counterfeit mark has been applied thereto, the use of which is likely to cause confusion, to cause mistake, or to deceive." Put succinctly, to obtain a conviction under § 2320(a), the government was required to prove that Cone and Zhao "(1) trafficked or attempted to traffic in goods or services; (2) did so intentionally; (3) used a counterfeit mark on or in connection with such goods and services; and (4) knew the mark was counterfeit." *United States v. Lam*, 677 F.3d 190, 197-98 (4th Cir. 2012) (quoting *United States v. Habegger*, 370 F.3d 441, 444 (4th Cir. 2004) (internal quotation marks omitted).

The key issue regarding the material alteration theory is what constitutes a "counterfeit mark" under the statute. A "counterfeit mark" is defined in § 2320(e)(1) as "a spurious mark." That is, a trademark used in connection with goods or labels, "that is identical with, or substantially indistinguishable from, a [registered] mark . . . the use of which is likely to cause confusion, to cause mistake, or to deceive." *Id.* § 2320(e)(1)(A)(i). The statute provides no further definition of what constitutes a "spurious" mark; however, we recently

relied on the definition provided by *Black's Law Dictionary* to define the term as "deceptively suggesting an erroneous origin; fake." *Lam*, 677 F.3d at 202 (quoting *Black's Law Dictionary*, 1533 (9th ed. 2009) (brackets omitted)).

In order to subject a defendant to criminal liability under § 2320, the government must therefore show that the defendant knowingly trafficked in goods or labels bearing a *spurious* mark. The requirement of a spurious mark is problematic for the government's "material alteration" theory that Cone and Zhao obtained a genuine Cisco product bearing a genuine mark; modified the product, but not the mark; then sold the modified product bearing the genuine mark. The government's contention is that the modification (the material alteration) of the Cisco product to something other than the exact device Cisco originally manufactured transforms not only the genuine product into a counterfeit product but also the genuine mark into a spurious mark. We do not find that § 2320 can be properly read as the government contends without rewriting the statute: an act the Congress, but not this court, can undertake.

The concept put forth by the government, that product modification can transform an unaltered genuine mark into a spurious one, does not appear in the plain language of § 2320, and is not "clearly warranted by the text" of that statute. *See Crandon v. United States*, 494 U.S. 152, 160 (1990). Indeed, Congress could have explicitly criminalized in § 2320 the practice of modifying genuine goods that bear a genuine, unaltered mark, but it did not do so. Rather, Congress made criminal the practice of "using a *counterfeit* mark" in connection with "traffic[king] of goods or services," and "trafficking" in containers and labels with knowledge "that a counterfeit [i.e., fake] mark has been applied thereto." *See* 18 U.S.C. § 2320(a). Congress has simply not criminalized in § 2320 the acts that the defendants are accused of committing under the material alteration theory in this case: altering a product with a genuine mark but not altering the mark.

While we are confident that the text of § 2320(a), standing on its own, does not support the government's material alteration counterfeit theory, our conclusion is significantly bolstered by the existence of the so-called "authorized use" exception found at § 2320(e)(1)(B). That subsection provides that:

> such term ["counterfeit mark"] does not include any mark or designation used in connection with goods or services . . . of which the manufacturer or producer was, at the time of the manufacture or production in question, authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation.

18 U.S.C. § 2320(e)(1)(B).

This subsection makes clear that Congress did not intend to criminalize, in the statute it adopted, the use of genuine and unaltered marks on goods that were manufactured by or for the mark holder. As one commentator has explained, "[a] plain reading and literal interpretation of [the authorized use exclusion] excludes from [the statute's] definition of counterfeit goods those products which have their genesis in authorized production." Brian J. Kearney, Note, *The Trademark Counterfeiting Act of 1984: A Sensible Legislative Response to the Ills of Commercial Counterfeiting*, 14 Fordham Urb. L.J. 115, 142 n.154 (1986).

Our conclusion rejecting the government's material alteration theory is further underscored by the novelty of the material alteration approach as posited by the government. Indeed, the government cites no case, and we can identify none, where a criminal conviction under the counterfeiting statute has been sustained for the type of "material alteration" conduct alleged here. The cases the government does cite are significantly distinguishable.

The government asks us to follow *United States v. Milstein*, 401 F.3d 53 (2d Cir. 2005), a case in which the Second Circuit affirmed the counterfeiting conviction of a defendant accused of purchasing drugs manufactured for foreign markets, repackaging them for sale in the United States without the consent of the manufacturers, and representing to the public that the drugs were FDA approved when they were not. *Id.* at 62. *Milstein*, however, is inapposite because the defendant "obscured the fact that the drugs had been repackaged, and, with his package design, fraudulently conveyed that the foreign drugs had been manufactured as FDA-approved products." *Id.* at 63. The *Milstein* defendant manufactured counterfeit packaging "designed to resemble . . . authentic packaging." *Id.* In this case, by contrast, the Cisco mark was and remained a genuine mark. *Milstein*, which involved an actual spurious, i.e., fake mark, provides no support for the proposition that genuine marks can lose their genuine character by virtue of alteration only of the good to which the mark was correctly attached when that good was produced.

The government also relies on *United States v. Farmer*, 370 F.3d 435 (4th Cir. 2004), for the proposition that because after-market alteration removes a measure of quality assurance from the original manufacturer, marketing the altered products as genuine is prohibited under § 2320(a). In *Farmer*, this court upheld the counterfeiting conviction of a defendant accused of "purchasing blank t-shirts and sweatshirts manufactured for companies like Nike and Hilfiger, placing those companies' logos on the shirts without authorization, and then passing along the shirts to the public as brand-name goods." *Id.* at 436. The defendant in that case purchased authentic shirts from authorized manufacturers, and then affixed the unauthorized brand-name mark to represent the good as being brand-name marked.

*Farmer*, however, is materially different from the case at bar. Critically, the mark that was affixed to the goods at issue was not genuine, being fraudulently affixed by the defendant

himself, thereby rendering the mark a "spurious mark." In contrast to the marks genuinely affixed by Cisco to the goods before being acquired by JDC, the placement of the marks in *Farmer* was never authorized by the manufacturer at any time during the manufacture of the goods in question. *See id.* at 440 ("[i]t was Farmer rather than the trademark holder who oversaw the construction of the shirts."). *Farmer* therefore does not support the government's material alteration theory of counterfeiting that genuine marks lose their genuine character solely from product alteration.

Additionally, the government argues that we should adopt, for purposes of the criminal counterfeiting statute, certain trademark applications under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, the statute governing civil trademark disputes.[7] The government argues that cases under the Lanham Act support the proposition that a genuine mark becomes counterfeit when the product is altered in a way not approved by the original manufacturer. *See Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 620 (9th Cir. 1993) ("by the time the Intel markings had been scraped off or printed over, Intel did make the chip but it was no longer the source of the *product* which was being sold.").

As the government correctly notes, we recently stated that, "[b]ecause of the similarity between [the Lanham Act] definition [of counterfeit] and the § 2320 definition of 'counterfeit

---

[7]*E.g.*, *Rolex Watch USA v. Meece*, 158 F.3d 816, 827 (5th Cir. 1998) (upholding civil counterfeiting judgment against defendant who modified "new, genuine Rolex watches" with "non-genuine parts to make them resemble more expensive Rolex watches"); *Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*, 106 F.3d 894, 896 (9th Cir 1997) (defendant is liable for civil counterfeit where defendant purchased genuine, used Westinghouse Circuit breakers, refurbished them, and reattached genuine labels); *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 619 (9th Cir. 1993) (affirming civil judgment against defendant who purchased "slow" Intel-brand microchips and relabeled them as "fast" and more expensive chips.).

mark,' we find Lanham Act civil counterfeiting cases helpful to our analysis of criminal counterfeiting cases brought under § 2320(a)." *Lam*, 677 F.3d at 199 n.8.[8] Helpful though these cases may be, it does not necessarily follow that we import every aspect of civil counterfeiting jurisprudence into the criminal counterfeiting context. Indeed, as we recognized in *Lam*, "the standard may 'be construed more narrowly in a criminal context than in a civil context.'" *Id.* (quoting *United States v. Guerra*, 293 F.3d 1279, 1288 (11th Cir. 2002)).

As a number of courts have recognized, § 2320 must be construed more narrowly than the civil law definition of counterfeit acts contained in the Lanham Act. *See United States v. Giles*, 213 F.3d 1247, 1250 (10th Cir. 2000) ("[W]e must construe [the criminal counterfeiting statute more] narrowly [than the Lanham Act]."); *United States v. Hanafy*, 302 F.3d 485, 489 (5th Cir. 2002) ("Lanham Act precedent is of little value in a § 2320 case because the Lanham Act deals with civil liability.") (citing *Giles*, 213 F.3d at 1250); *Guerra*, 293 F.3d at 1288 ("The 'identical or substantially indistinguishable' standard [in the counterfeit context] is to be construed more narrowly in a criminal context than in a civil context.").

Indeed, even the civil cases to have found Lanham Act liability based on material alteration have acknowledged that such a theory of liability strays from a strict statutory definition of "counterfeit." *See Rolex Watch USA*, 158 F.3d at 826 ("The original . . . labels are not themselves 'counterfeits' in the literal sense.") (quoting *Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.*, 106 F.3d 894, 899 (9th Cir 1997)). In doing so, those courts relied upon a rationale critical in the civil trademark infringement context: "the important test is whether the practice of the defendant is likely

---

[8]The Lanham Act defines "counterfeit" in a manner similar to the criminal counterfeiting statute: "A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.

to cause confusion, *not whether the defendant duplicated the plaintiff's mark*." *Westinghouse*, 106 F.3d at 899 (citing *Continental Motors Corp. v. Continental Aviation Corp.*, 375 F.2d 857, 861 (5th Cir. 1967) ("Confusion, or the likelihood of confusion . . . is the real test of trademark infringement."). In applying a criminal statute, however, we do not have the freedom to disregard an element of the crime: that the defendant did, in fact, employ a counterfeit mark. *See* 18 U.S.C. § 2320(a).

Moreover, Zhao and Cone have correctly identified a second material difference between the Lanham Act and § 2320: the Lanham Act lacks an authorized use exception. Thus, our conclusion that under the § 2320(e)(1)(B) authorized use exception Congress did not intend to criminalize the use of genuine marks used on goods that were manufactured by or for the mark holder distinguishes this case from those civil cases cited by the government. No court, in interpreting the Lanham Act to allow material alteration liability, has even had the opportunity to opine on whether an authorized use exception (such as that codified at § 2320(e)(1)(B)), would preclude such liability in the civil context of trademark infringement.

For all the reasons just discussed, we find that criminal liability under § 2320 cannot be based on the alteration of a product to which a genuine mark was affixed and the mark itself has not been altered. The Congress can certainly rewrite that statute to cover a material alteration theory, but the statute as now written does not do so.

We must now apply our holding on the scope of § 2320 to the facts of this case and determine what, if any relief is available to Cone and Zhao. Based on our review of the indictment, and the evidence adduced at trial, we first conclude that Zhao's conviction under Count 9, a substantive counterfeiting charge against her, must be vacated.

Count 9 charged Zhao with, "on June 16, 2010, . . . intentionally traffic[king] in . . . a counterfeit Cisco unit." (J.A. 74.) The evidence adduced at trial showed that in 2010 the U.S. Fish and Wildlife Service ("FWS") purchased an "enhanced" Cisco switch from Memorydealers.com, which in turn had purchased the switch from JDC. When the switch arrived, officials at FWS became aware that they had received a "standard" model, rather than the enhanced version they had purchased. The MAC address[9] of the switch was assigned to a standard model, while the serial number on the chassis was assigned to an "enhanced" switch. Thus, the government adduced evidence that a standard model switch was purchased from Cisco, which had a proper and genuine Cisco mark affixed to it. Zhao, through JDC, later upgraded the product to resemble an enhanced model switch, and sold it to Memorydealers.com as an enhanced switch. The mark, however, was genuinely affixed to the good when manufactured by or for Cisco and the mark itself was never altered. That conduct is not, we conclude, criminal counterfeiting because the unaltered genuine mark is not a spurious mark, a required element of the crime under § 2320. Thus, Zhao's conviction for Count 9 cannot stand and must be vacated.

Cone and Zhao argue that their convictions for conspiracy under Count 1 must also be vacated. This is so, they contend, because the jury's verdict was a general one and it is impossible to determine whether the conspiracy convictions rested upon the invalid material alteration theory as opposed to the valid theory of improperly declared goods also charged under Count 1.

Zhao and Cone are correct to state that "reversal is required when a case is submitted to a jury on two or more alternate theories, one of which is legally (as opposed to factually) inadequate, the jury returns a general verdict, and it is impos-

---

[9]A "MAC address" is an identification feature, unique to each item, imprinted by the manufacturer on networking equipment.

sible to discern the basis on which the jury actually rested its verdict." *United States v. Moye*, 454 F.3d 390, 400 n.10 (4th Cir. 2006) (en banc) (citing *Yates v. United States*, 354 U.S. 289, 311–12 (1957)).

In this case, however, the jury returned a special, not a general verdict as to Count 1. Indeed, the jury was given and utilized, without objection, a special verdict form. On that verdict form the jury found Cone and Zhao guilty of conspiracy to traffic in counterfeit goods and labels, *and* separately found them guilty of conspiracy to import and sell improperly declared goods. We recently addressed a similar situation in *United States v. Lawson*, 677 F.3d 629 (4th Cir. 2012). In that case, after determining that certain juror misconduct rendered a conviction for conspiracy to violate the Animal Welfare Act invalid, we determined whether the defendants' convictions for a single count of conspiracy could nevertheless be affirmed where the indictment alleged a multi-object conspiracy in the conjunctive. We reasoned that

> in contrast to the general verdict rendered in *Yates*, the verdict in the present case reveals that the jury had two separate bases for convicting the . . . defendants of the conspiracy charges. Although the indictment alleged both objects in a single count, the jury's verdict forms with respect to each of the . . . defendants listed separate guilty verdicts for "Count 1—Conspiracy (Animal Welfare Act: June 18, 2008 through April 18, 2009)" and "Count 1—Conspiracy (illegal gambling business: May 2007 through April 18, 2009)." Thus, we are not confronted with a situation in which we are uncertain whether a jury's verdict was solely attributable to an underlying conviction which we have set aside on legal grounds. *Cf. Yates*, 354 U.S. at 311–12. Accordingly, the conspiracy convictions for the . . . defendants are supported by a valid and independent legal basis that is

apparent from the record, and we therefore affirm those convictions.

*Id.* at 655. Likewise, the conspiracy convictions in this case are supported by a "valid and independent legal basis," *id.,* because of the separate verdict form, and we accordingly affirm the conspiracy convictions of both Cone and Zhao.[10]

Our review of the presentence investigation report ("PSR") and the record of the sentencing hearing, however, plainly demonstrates that the district court relied on the counterfeiting object of the conspiracy convictions in fashioning the sentences for Cone and Zhao. Because the district court may have utilized what we have now determined would be non-criminal acts under the material alteration theory of counterfeiting conspiracy in arriving at the sentences, we must also vacate the sentences of both Cone and Zhao and remand for resentencing.

### B.   Sufficiency of the Evidence

### i.   Counts 8 and 10 against Zhao

In addition to her challenges to Count 1 and Count 9, Zhao also argues that Counts 8 and 10 should be vacated because the evidence was insufficient, as a matter of law, to prove that she engaged in § 2320 criminal counterfeiting. We agree with Zhao as to Count 10, but not Count 8.

"A defendant challenging the sufficiency of the evidence faces a heavy burden." *United States v. Foster,* 507 F.3d 233, 245 (4th Cir. 2007). In a sufficiency of the evidence chal-

---

[10]While we have determined that the acts charged to Zhao under Count 9, and to both Zhao and Cone under the material alteration portion of Count 1, are not criminal acts under § 2320, nothing in our opinion should be construed to affect their prosecution under any other state or federal statute which may apply to these acts.

lenge, we view the evidence on appeal in the light most favorable to the government in determining whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *United States v. Collins*, 412 F.3d 515, 519 (4th Cir. 2005). We review both direct and circumstantial evidence, and accord the government all reasonable inferences from the facts shown to those sought to be established. *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008). We do not review the credibility of the witnesses and assume that the jury resolved all contradictions in the testimony in favor of the government. *United States v. Kelly*, 510 F.3d 433, 440 (4th Cir. 2007). We will uphold the jury's verdict if substantial evidence supports it and will reverse only in those rare cases of clear failure by the prosecution. *Foster*, 507 F.3d at 244–45.

With respect to the products at issue in Count 8, four routers seized by CBP in 2010, prosecution expert and Cisco engineer Michael Heidecker opined that the MAC addresses found on the routers matched physically different products manufactured by Cisco. (*See* J.A. 1052-54.) Furthermore, Heidecker opined that the labels applied to the routers were nongenuine. Thus, Heidecker was able to conclude that the routers at issue were not manufactured by or for Cisco and could not be genuinely marked. While Zhao's expert reached a different conclusion, this conflicting evidence was for a jury to weigh. The jury had ample evidence on which to conclude that Zhao was guilty as charged in Count 8.

On Count 10, however, the Government did not carry its burden to show that Zhao engaged in the criminal counterfeiting of marks. Count 10 charges that JDC sold counterfeit Cisco transceivers to Vology, a reseller of network equipment. The government alleges that these transceivers were not made by or for Cisco, but identifies only two pieces of evidence in support of this claim.

First, the government points to testimony from Craig Grant, a Vology manager, who testified that, upon receipt of the

transceivers, he was able to tell from his experience that the *packaging* was not genuine. Congress, however, has chosen to bar the government from bringing "a criminal cause of action . . . for the repackaging of genuine goods or services not intended to deceive or confuse." 18 U.S.C. § 2320(g). Evidence of repackaging, therefore, is not enough standing alone to prove the goods within that packaging bear a counterfeit mark. The government must come forth with some other evidence that the mark on the actual good is spurious.

To that end, the government's second piece of evidence for Count 10 is that law enforcement seized "additional versions" of the transceivers at issue in Count 10 from Zhao's residence, which Heidecker opined were not made by or for Cisco. However, the Vology transceivers were not introduced at trial, having been returned to JDC and resold. Whatever marks the "additional versions" of the transceivers may (or may not) have borne does not prove the status of the marks on the long gone Vology transceivers. No evidence at trial established what marks were on the Vology transceivers; a burden which fell to the government to bear.

Heidecker opined only that the packaging of the transceivers found at Zhao's home was inauthentic. (J.A. 1024.) He gave no testimony about the marks on the Vology transceivers.

Since the "repackaging" evidence cannot, under the plain terms of § 2320(g), sustain a conviction under the statute for a counterfeit mark on the goods in the package, and as the government adduced no evidence on the marks on the Vology transceivers, the government failed to prove a violation of § 2320 for the acts charged in Count 10. The evidence was insufficient as a matter of law to sustain Zhao's conviction.

Accordingly, while we find that the government adduced sufficient competent evidence to sustain Zhao's conviction

under Count 8, we find that the government did not do so with respect to Count 10, and vacate that count of conviction.

### ii. Sufficiency of the Evidence Against Cone

Cone individually challenges his conviction for conspiracy to import misdeclared goods (Count 1) by arguing that the evidence was insufficient and the district court accordingly erred in denying his Rule 29 motion for judgment of acquittal. We review the district court's denial of a Rule 29 motion de novo. *Lam*, 677 F.3d at 198. The legal standard for a sufficiency of the evidence claim is set forth above at p. 22.

In Count 1, the government alleged Cone participated in a conspiracy to violate 18 U.S.C. § 545, which criminalizes "fraudulently or knowingly import[ing] or bring[ing] into the United States, any merchandise contrary to law." *Id.* Cone was alleged to have conspired to import goods without taking reasonable care to ensure that the goods were properly declared, in violation of 19 U.S.C. § 1484(a).

> To establish a conspiracy under § 371, the Government must prove "(1) an agreement between two or more people to commit a crime, and (2) an overt act in furtherance of the conspiracy." *United States v. Ellis*, 121 F.3d 908, 922 (4th Cir. 1997). "The existence of a tacit or mutual understanding between conspirators is sufficient evidence of a conspiratorial agreement." *Id.* (internal quotation marks omitted). Proof of the agreement may be established by circumstantial evidence. *Burgos*, 94 F.3d at 857. It is no defense to a conspiracy charge that one's role in the conspiracy is minor. *See United States v. Laughman*, 618 F.2d 1067, 1076 (4th Cir. 1980) ("Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the connection is slight, is sufficient to convict him with

knowing participation in the conspiracy." (internal quotation marks omitted)).

*United States v. Kingrea*, 573 F.3d 186, 195 (4th Cir. 2009).

With the standards of review in mind, we have little difficulty concluding that the government adduced sufficient evidence from which the jury could properly convict Cone under Count 1. Cone was unquestionably an active participant in the scheme to sell counterfeit, mislabeled, or undeclared Cisco products. The evidence adduced at trial showed that Cone confessed to law enforcement that he was a member of that conspiracy. He acknowledged in his confession that he was aware that Han Tong employees were misdeclaring goods to avoid detection by CBP. Furthermore, when he became estranged from Zhao, he sent e-mails to her demanding his share of proceeds from the conspiracy.

This is not a case, as Cone suggests, where an innocent spouse is implicated solely by his marriage to a conspirator. *See United States v. Dozie*, 27 F.3d 95, 98 (4th Cir. 1994) (vacating conspiracy conviction against co-defendant's spouse who "was never tied to the conspiracy by any of the other persons involved"). Rather, the record contains ample evidence from which the jury could have properly concluded that Cone was an active participant in the conspiracy. We accordingly see no merit to Cone's contention that there was insufficient evidence to support his conviction on Count 1.

### iii.   Money Laundering

Zhao further contends her convictions for money laundering must be vacated on the basis that the government's incorrect "material alteration" theory may have formed the basis for her money laundering convictions.[11] We agree.

---

[11]Zhao was also charged with a third count of money laundering, Count 26, on which she was acquitted by the jury.

Zhao was convicted of two counts (Count 27 and 28) of "concealment" money laundering. *See* 18 U.S.C. § 1956(a)(2)(B)(i); (a)(1)(B)(i). She was also convicted of Count 29, engaging in a monetary transaction with criminally derived proceeds in violation of 18 U.S.C. § 1957(a) (collectively "the money laundering convictions").

To obtain a conviction under § 1956(a)(1)(B)(i) (Count 28), the government had the burden to prove four elements:

> (1) an actual or attempted financial transaction; (2) *involving the proceeds of a specified unlawful activity*; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) knowledge that the transaction was designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity.

*United States v. Richardson*, 658 F.3d 333, 337-38 (3d Cir. 2011) (internal quotation marks, brackets, and ellipsis omitted) (emphasis added). The elements of a violation of § 1956(a)(2)(B)(i), as charged in Count 27, are similar, with the additional requirement that the government prove an international transaction involving the proceeds of unlawful activity. *See Cuellar v. United States*, 553 U.S. 550, 553 (2008). Finally, as to Count 29, § 1957(a) similarly requires the government to allege (and prove) a transaction involving funds derived from a specified unlawful activity. *See United States v. Cherry*, 330 F.3d 658, 668 (4th Cir. 2003).

In this case, the district court instructed the jury properly as to each offense, observing that, to sustain a conviction under Counts 27, 28, and 29, the government must prove beyond a reasonable doubt that Zhao engaged in monetary transactions that, *inter alia*, involved funds derived from the offense of trafficking in counterfeit goods or labels. (*See* J.A. 2430-37.)

As the Supreme Court has explained,

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law-whether, for example, the action in question . . . fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.

*Griffin v. United States*, 502 U.S. 46, 59 (1991). Accordingly, "a verdict [is required] to be set aside in cases where the verdict is supportable on one ground, but not another, and it is impossible to tell which ground the jury selected." *Yates v. United States*, 354 U.S. 298, 312 (1957). *But see United States v. Hastings*, 134 F.3d 235, 242 (4th Cir. 1998) ("If [the] evidence is such that the jury must have convicted the defendant on the legally adequate ground in addition to or instead of the legally inadequate ground, the conviction may be affirmed.").

While it is no doubt correct that the government adduced ample evidence tending to show that Zhao committed "pure" counterfeiting, neither the indictment, nor the evidence adduced at trial allow us to conclude that the jury necessarily convicted Zhao of money laundering based on the government's "pure" counterfeiting theory.

Agent Hilario testified, in support of Count 27, that JDC and Han Tong engaged in a series of wire transfers in June, 2010, designed to conceal the funds' source. The source of these funds was derived largely, if not entirely, from sales, by JDC, of goods purchased from Han Tong. The evidence of these sales, introduced in the form of Zhao's ledgers, simply does not allow us to determine whether the sales were of "pure" counterfeits, or of "materially altered" goods, which, as

discussed *supra*, do not constitute counterfeit marks for the purposes of § 2320.

The government's evidence in support of Count 28 consisted solely of testimony from ICE agent Raymond Orzel, a certified fraud examiner. Orzel testified that Zhao purchased a home in 2005 with funds derived from JDC, Han Tong, and related entities. (J.A. 1520-21.) In 2008, Zhao sold the home to an individual named Dan Lou, (an indicted co-conspirator) who rented the home out. However, the government also put forth evidence that the funds Lou used to purchase the home were drawn from Zhao's accounts, and that rent checks made out to Lou were deposited in accounts controlled by Zhao. Once again, the funds at issue were derived from JDC sales of Han Tong goods. We cannot say with any certainty that the jury only considered sales of "pure" counterfeits when convicting Zhao of Count 28.

In support of Count 29, the government adduced evidence that Zhao directed that two $50,000 checks be drawn from JDC accounts to Marcie Wu, an affiliate of Han Tong. The checks represented, in large part, the proceeds of the sales of certain Cisco switches from JDC to Network Hardware Resale ("NHR"). (*See* J.A. 1964-66.) These switches were obtained from Han Tong, and the evidence adduced at trial demonstrated that the switches were manufactured by or for Cisco, and then later altered by Zhao. Because this conduct is not criminal counterfeiting, the jury's verdict of conviction on Count 29 rests on an unsound legal basis.

Thus, the money laundering convictions must be vacated. Count 29 appears to clearly rest on an improper legal basis, and because we cannot say with certainty whether Zhao's convictions on Counts 27 and 28 are based on "pure" counterfeiting, those convictions must be vacated as well.

iv.

Our distinguished colleague in dissent concurs in the foregoing analysis concerning the "material alteration" theory, but

suggests that Zhao's conviction on Count 8, a substantive counterfeit charge, should also be vacated. We respect the views of the dissent but do not agree.

The general thesis of the dissent is that, having held that the government's "material alteration" theory of counterfeiting is without legal basis, we should have vacated Count 8 owing to improper closing argument by the government. However, at oral argument, when asked by the panel what specific counts of the indictment would be affected by our rejection of the "material alteration" theory, counsel for Zhao responded that such a holding would "most clearly" affect substantive Count 9 and Count 1 (conspiracy). Audio Recording of Oral Argument at 1:30. Counsel, of course, could have argued that vacatur of Count 8 was appropriate as well, but chose to focus entirely on Counts 9 and 1. This is not surprising, as the record is conclusively clear that at no point in the district court or this court, did Zhao raise a claim of error under the material alteration theory as to Count 8. This concept arises *sua sponte* for the first time in the dissent.

The representations of Zhao's counsel to the panel at oral argument were entirely consistent with the arguments set forth in her briefs before this Court and the district court. Indeed, although Zhao contends that Count 8 should be vacated, her argument rests entirely on a sufficiency of the evidence basis, which we rejected in section II(A)(ii), above. (*See* Opening Br. of Appellant at 36-38).

The dissent acknowledges as much, but argues that because the government argued a legally incorrect theory to the jury in closing argument, deference to the jury's verdict is not warranted. To reach this result, the dissent analyzes the government's remarks under *United States v. Lighty*, 616 F.3d 321, 361 (4th Cir. 2010). Again, a construct appearing for the first time now, *sua sponte*, and which, under our precedent, has long since been waived by Zhao.

Zhao never made the argument that is the lynchpin of the dissenting opinion: that the prosecutor's closing comments, in and of themselves, constitute reversible error. *See Post* at 53 ("A prosecutor's comments *constitute reversible error* if . . . ."). Zhao's briefs on appeal are utterly devoid of any reference to the *Lighty* factors because Zhao does not make a stand-alone challenge to the government's statements in closing argument. Rather, to the extent that Zhao discusses the prosecutor's closing arguments at all, it is for purposes of the harmless error analysis under Count 1 only.

Zhao's failure to raise this independent assignment of error, either in brief or at oral argument, regarding the government's comments to the jury is fatal to the position advocated by the dissent. *See United States v. Strieper*, 666 F.3d 288, 293 n.4 (Floyd, J.) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6) (4th Cir. 1999)) ("This argument does not appear in [Appellant's] brief, and as such, it is waived."). Granting relief on a basis not advanced by Zhao (and arguably disclaimed at oral argument) is plainly improper for all the reasons the rule of waiver is in force. The government has not had any opportunity to respond to the claim of error advanced by the dissent, nor was it ever placed before the district court for consideration.[12] *See Cavallo v. Star Enterprise*, 100 F.3d 1150, 1152 n.2 (4th Cir. 1995) ("The [Appellants'] omission of the issue from their initial brief denied [Appellee] an opportunity to respond, so considering it now would be unfair to the appellee and would risk an improvident or ill-advised opinion on the legal issues raised.") (quoting *Hunt v. Nuth*, 57 F.3d 1327, 1338) (4th Cir. 1995) (internal quotation marks omitted)).

---

[12]Because the government never had the opportunity to address an appellate challenge to its closing arguments, the dissent's assertion that the government has "waived waiver" is misplaced and a conclusion of pure speculation. Had Zhao raised an independent challenge to the government's closing remarks, the government could have asserted the waiver bar in response, but was never put on notice to do so.

Additionally, we do not consider the issue of the prosecutor's comments on appeal as they were not preserved by Zhao in the district court. We have long held that the failure to object to a prosecutor's statements made during closing arguments constitutes a waiver of that claim of error. *See United States v. Sawyer*, 347 F.2d 372, 374 (4th Cir. 1965) ("[I]f defense counsel does not object during the course of the Government's closing argument he may be said to have waived the point.").

The mere fact that Zhao challenged, as a general matter, the "material alteration" theory presented by the government is insufficient to preserve the claim of error formulated by the dissent. This is so because, as explained above, the dissent's theory is based on a stand alone prosecutorial misstatement claim. Indeed, the dissent acknowledges that the theory presented by the prosecution during closing statements "was even broader than the material alteration theory advanced in the government's' proposed jury instruction." *Post*, at 45. Accordingly, Zhao's pre-trial challenge to the government's proposed jury instructions would not preserve a claim of error as to the prosecutor's unchallenged remarks in closing.

It is for that reason that the dissent's reliance on *Lacy v. CSX Transportation, Inc.*, 520 S.E.2d 418 (W. Va. 1999), is unavailing. In that case, as the dissent observes, the court found that an unsuccessful motion in limine was sufficient to preserve a challenge to later closing remarks by the opposing party so long as the argument fell within the scope of the court's earlier ruling on the motion. *Id.* at 427. In this case, though, as the dissent acknowledges, Zhao succeeded in her motion in limine. It makes sense, therefore, that if the prosecutor's closing remarks ran afoul of the district court's prior ruling, Zhao should have timely objected to alert and afford the court an opportunity to correct any error.[13]

---

[13]Moreover, contrary to the dissent's suggestion, at 47, Zhao never argues in her post-verdict motion for acquittal that the government's

The dissent does correctly observe that Zhao's brief on appeal mentions the government's closing arguments. But even a superficial reading of the briefs demonstrates that, far from raising an independent challenge to the prosecutorial statements, Zhao was merely describing what the prosecutor said, or, in one case, noting that any error in the government's theory of prosecution was non-harmless. *See* Appellants' Br. at 39-40. The dissenting opinion goes several steps farther, raising, for the first time, a stand alone challenge to the prosecutorial remarks.

For those reasons, the cases cited by the dissent in favor of its position are, in our view, inapposite. Judge Floyd's dissent in *Lam*, for example, cited twice in the dissenting opinion, observed that "the district court has sustained repeated objections to the [prosecutorial] statement." *Lam*, 677 F.3d at 212. Here, the district court did not sustain any objection because none was made. Thus the government was deprived of the opportunity to make the case that its argument was proper, and the district court was deprived of the opportunity to correct any purported error. *See United States v. Hargrove*, 625 F.3d 170, 184 (4th Cir. 2010) ("Hargrove failed to object . . . at the time, thus denying the district court the opportunity to consider Hargrove's argument and correct the purported error.").

Accordingly, while we respect the views of the dissent, we do not agree that the claim of error on which the dissent would vacate Count 8 was properly preserved by the Zhao or raised in this court or the district court.

## C.   Confrontation Clause

Zhao argues that the district court committed reversible error by admitting Cone's out-of-court statements to Agent

---

remarks were improper as to the "material alteration" theory. She only argues that the prosecutor made certain statements, unrelated to the present appeal, that were unsupported by the evidence. *See* Zhao's Mot. Judgment of Acquittal 7 n.8, ECF 240. Nowhere in Zhao's motion as to Count 8 does she mention the material alteration theory. *Id.* at 5-7.

Hilario into evidence against her. The core of Zhao's claim is that substituting "another individual" for her name made it obvious to the jury that she was the person referenced and thereby violated her Sixth Amendment Confrontation Clause rights.

In *Bruton*, the Supreme Court held: "[A] defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 201-02 (1987) (citing *Bruton v. United States*, 391 U.S. 123, 135-36 (1968)). This court reviews de novo an evidentiary ruling implicating the Confrontation Clause. *United States v. Palacios*, 677 F.3d 234, 242 (4th Cir. 2012).

In *United States v. Akinkoye*, 185 F.3d 192 (4th Cir. 1999), we summarized Supreme Court precedent as holding that "if a redacted confession of a non-testifying codefendant given to the jury (by testimony or in writing) shows signs of alteration such that it is clear that a particular defendant is implicated, the Sixth Amendment has been violated." *Id.* at 197. We further noted that the Supreme Court's precedent did not directly address the situation in that case–"namely, whether redacted statements that refer to the existence of another party who may be the defendant through symbols or neutral pronouns are admissible," and observed that "[t]he Supreme Court has strongly implied that such statements do not offend the Sixth Amendment." *Id.* at 198.

In *Akinkoye*, the co-defendant's confessions were retyped so as to replace "the defendants' respective names with the phrase 'another person' or 'another individual.'" *Id.* The retyped versions were read to the jury, and the jury "neither saw nor heard anything in the confessions that directly pointed to the other defendant." *Id.* Accordingly, we held that the defendants' Confrontation Clause rights were not violated

by the redacted statements because use of the neutral phrase "another person" did not facially implicate the defendant. *Id.*

Applying the holding of *Akinkoye* to the case at bar, we readily conclude that substitution of Zhao's name with "another individual" was sufficient to protect Zhao's rights under the Confrontation Clause. The phrase "another individual" does not facially implicate Zhao. Only by reference to other evidence could the jury have arrived at the conclusion that Zhao was the actual subject of Cone's out of court statement. In such circumstances, we have concluded that the Confrontation Clause is not offended, and thus Zhao's claim lacks merit.

## D.   Introduction of Customer E-Mails

Cone and Zhao last argue that the district court erred in admitting certain e-mails from JDC customers complaining that JDC products were "counterfeit" and "fake." Although the district court determined that the e-mails were introduced for a non-hearsay purpose, i.e., to show that Zhao and Cone were on notice that they were selling counterfeit goods, the court declined to give a limiting jury instruction to that effect and instead stated that "the e-mails say what they say and the jury will have to decide if they're believable or not. That's their job." (J.A. 1673-74.) Cone and Zhao contend that the court's actions constitute reversible error.

This Court reviews evidentiary rulings for an abuse of discretion and "will only overturn an evidentiary ruling that is 'arbitrary and irrational.'" *United States v. Cloud*, 680 F.3d 396, 401 (4th Cir. 2012) (quoting *United States v. Cole*, 631 F.3d 146, 153 (4th Cir. 2011)). Evidentiary rulings are subject to harmless error review, such that any error is harmless where we may say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the

error." *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010).

At the outset, we believe that the district court properly admitted the e-mails for the non-hearsay purpose of showing that Cone and Zhao were on notice as to the counterfeit nature of the goods they sold. *See* 5-801 *Weinstein's Federal Evidence* § 801.11[5][a] (Out of court statement not hearsay when "offered not for [its] truth but to prove the extent of . . . a recipient's notice of certain conditions.").

We are troubled, however, by the court's response to counsel's request for a limiting instruction. Indeed, while the e-mails may have been properly admitted for a reason other than their truth, the district court stated just the opposite—that the jury will have to decide "if they're believable or not." In other words, the court erroneously instructed the jury to consider statements contained in the e-mails for the truth of the matter asserted.

The government contends, nonetheless, that the court's statement was not error because the statements in the e-mails could have been admitted under a hearsay exception, namely the business records exception to the hearsay rule, found at Federal Rule of Evidence 803(6). We are not persuaded.

Rule 803(6)(B) allows for the introduction of records that are "kept in the course of a regularly conducted activity of a business." For a record to be admitted as a business record, it must be "(1) made by a regularly conducted business activity, (2) kept in the 'regular course' of that business, (3) 'the regular practice of that business to make the memorandum,' (4) and made by a person with knowledge or from information transmitted by a person with knowledge." *Clark v. City of L.A.*, 650 F.2d 1033, 1036-37 (9th Cir. 1981) (quoting Fed. R. Evid. 803(6)).

E-mails, however, present unique problems of recent vintage in the context of the business records exception. As one district court recently explained:

> Courts are in disagreement on whether emails can and should fall under the business records hearsay exception. The business records exception assumes that records containing information necessary in the regular running of a business will be accurate and reliable. *See Certain Underwriters at Lloyd's London v. Sinkovich*, 232 F.3d 200, 204–05 (4th Cir. 2000). Email, however, is typically a more casual form of communication than other records usually kept in the course of business, such that it may not be appropriate to assume the same degree of accuracy and reliability. As email is more commonly used to communicate business matters both internally and externally, however, more formal paper records are becoming more unusual.

*Its My Party, Inc. v. Live Nation, Inc.*, No. JFM-09-547, 2012 WL 3655470 at *5 (D. Md. Aug. 23, 2012) (unpublished). The district court in that case excluded the e-mails on the basis that the "more specificity is required regarding the party's recordkeeping practices to show a particular email in fact constitutes a reliable business record." *Id.*

While properly authenticated e-mails may be admitted into evidence under the business records exception, it would be insufficient to survive a hearsay challenge simply to say that since a business keeps and receives e-mails, then *ergo* all those e-mails are business records falling within the ambit of Rule 803(6)(B). "An e-mail created within a business entity does not, for that reason alone, satisfy the business records exception of the hearsay rule." *Morisseau v. DLA Piper*, 532 F. Supp. 2d 595, 621 n.163 (S.D.N.Y. 2008). The district court's observation that the e-mails were kept as a "regular operation of the business" is simply insufficient on that basis

alone to establish a foundation for admission under Rule 803(6)(B). Accordingly, because the e-mails could not, on this record, be admitted under an exception to the hearsay rule, the district court's failure to give the limiting jury instruction was error.

We conclude, however, that the any error in the court's jury instructions or failure to give an e-mail limiting instruction was harmless. In the context of a twelve-day jury trial in which the government adduced overwhelming evidence of Cone and Zhao's guilt, we cannot conclude that Cone or Zhao were prejudiced by this single error concerning a minute portion of the total evidence against them. As discussed above, the government further introduced physical evidence in the form of counterfeit labels seized from Zhao's home and storage unit. The government also introduced routers seized by CBP, that Heidecker (a Cisco engineer) identified as counterfeit goods.

The government also introduced evidence from Cone and Zhao themselves. In addition to Zhao's confession at the time of her arrest (that she sold "fake" goods in order to make more money), the government introduced incriminating e-mails from Cone to Zhao wherein Cone threatened to reveal the counterfeiting scheme to law enforcement if he did not receive his share of proceeds from the criminal venture. In sum, the government's evidence against Cone and Zhao was more than ample, and we conclude that the district court's jury instruction with respect to certain e-mails from JDC customers was harmless beyond a reasonable doubt.

## III.

Because we conclude that the government's material alteration theory of counterfeiting is not encompassed within the § 2320 statutory crime of counterfeiting marks, we vacate Zhao's conviction on Count 9. In light of this holding, we must vacate Zhao's convictions for Counts 27, 28, and 29. We

further hold that the evidence was insufficient as a matter of law to sustain Zhao's conviction on Count 10 and also vacate that conviction. We also vacate the sentences of both Cone and Zhao and remand for resentencing in light of our holding today. We affirm the judgment of the district court in all other respects.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

WYNN, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority's conclusion that the government's "material alteration" theory is not supported by the plain language of the criminal trademark counterfeiting statute, 18 U.S.C. § 2320. As a result, I also agree that this Court must reverse Defendant Zhao's conviction on Count 9, which involved a networking switch that the government concedes was manufactured by or for Cisco, and her three money laundering convictions, which were tainted by the material alteration theory. I further concur that the government adduced insufficient evidence to convict Defendant on Count 10 because the government's evidence at most showed that Defendant Zhao repackaged a genuine Cisco product.

However, I cannot join the majority in affirming Defendant Zhao's conviction on Count 8, the remaining trademark counterfeiting conviction potentially tainted by the errant material alteration theory. The government and Defendant Zhao presented conflicting evidence regarding whether the products at issue in Count 8 were manufactured by or for Cisco. In affirming that conviction, the majority considered the evidence adduced at trial in the light most favorable to the government. But such deference is unwarranted because the government argued its legally incorrect alteration theory to the jury and the district court did not provide an adequate

instruction to the jury regarding when a product that has its genesis in authorized production can serve as the basis for a trademark counterfeiting conviction. Because we do not know whether the jury properly credited the government's evidence or improperly credited the government's errant legal theory, this conviction also should be reversed.

In addition, I write separately to clarify that in resentencing Defendants Zhao and Cone on their conspiracy convictions the district court should not take into account evidence that Defendants altered one other type of Cisco product, which, like the switch at issue in Count 9, the government concedes was manufactured by or for Cisco. I further emphasize that this panel was not tasked with answering, and thus did not decide, whether the repackaging of an altered, but genuine product in a non-deceptive manner violates Section 2320 as a matter of law.

I.

Before explaining why Defendant Zhao's conviction on Count 8 should be reversed, it is first useful to provide some additional background on Section 2320, the government's material alteration theory, and the district court's instruction on the definition of "counterfeit" under Section 2320.

A.

Section 2320(a) makes it unlawful for anyone to "intentionally traffic[ ] or attempt[ ] to traffic in goods or services and knowingly use[ ] a counterfeit mark on or in connection with such goods or services . . . ." The statute defines a "counterfeit mark" as a "spurious mark that is used in connection with trafficking in any goods [or] services . . . that is identical with, or substantially indistinguishable from, a [registered] mark . . . the use of which is likely to cause confusion, to cause mistake, or to deceive . . . ." § 2320(e)(1)(A).

Section 2320 includes two provisions that deal with when the resale of an authentic or genuine good can serve as the basis for a trademark counterfeiting conviction: (1) an "authorized use" exception and (2) a "repackaging," or "gray goods," exception. As the majority correctly notes, the authorized use exception excludes from the definition of "counterfeit mark . . . any mark . . . used in connection with goods or services . . . of which the manufacturer or producer was, at the time of the manufacture or production in question, authorized to use the mark" by the trademark holder. § 2320(f)(1). The second exception bars the government from bringing "a criminal cause of action . . . for the repackaging of genuine goods or services not intended to deceive or confuse." § 2320(g). This applies to "gray goods," which are "goods that are authentic and that have been obtained from overseas and imported into the United States." *United States v. Hanafy*, 302 F.3d 485, 488 (5th Cir. 2002).

In *Hanafy*, the Fifth Circuit approvingly quoted its district court regarding the relationship between the two exceptions:

> A common denominator of these two exceptions is that the goods to which the mark is attached were manufactured by, or with the permission of, the owner of the mark—that is, the goods themselves are genuine. That Congress saw fit to exempt "gray market" goods and [authorized users] from criminal liability lends support to an interpretation that § 2320 was intended to prevent trafficking in goods that were similar to but different than the goods normally associated with the mark.

*Id.* (quoting *United States v. Hanafy*, 124 F. Supp. 2d 1016, 1023-24 (N.D. Tex. 2000)). Thus, the two exceptions jointly indicate that Congress intended generally to exclude from liability under Section 2320 sellers of goods that have their genesis in authorized production. Such an exclusion makes sense—one of the primary rationales for protecting trade-

marks is that they assist consumers in identifying the source of goods. *OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 339 ("Trademark law, at a general level . . . enabl[es] consumers readily to recognize products and their source and to prevent consumer confusion between products and between sources of products."). Therefore, it would make little sense for Congress to hold a reseller criminally liable for attaching a mark to a product if the mark correctly identifies the source of the product, and does so in a nondeceptive manner.

B.

Prior to trial, the government submitted a lengthy proposed instruction regarding the definition of "counterfeit," which provided, in pertinent part:

> [A] defendant cannot purchase genuine products manufactured by or for the registered owner, materially alter those products, and then offer the products for resale as genuine or unaltered products. . . . Such modifications convert a genuine product into a "counterfeit" product.

J.A. 160. This language was drawn almost entirely from federal district and appellate court decisions in civil actions brought under the trademark counterfeiting provisions in the Lanham Act.

Defendants Zhao and Cone filed a motion in limine seeking an advance ruling on the government's proposed instruction, arguing that the "material alteration" theory was not supported by the plain language of Section 2320 and had never been applied in criminal cases brought under the statute. Defendants requested that the "material alteration" language not be used, and instead proposed that the instruction state, in pertinent part:

A mark is counterfeit if, and only if . . . the challenged mark is spurious, which means false or inauthentic . . . .

Because a counterfeit mark must be false or inauthentic, the definition of counterfeit mark does not include any mark used in connection with goods or applied to labels or packaging if, at the time of manufacture of the goods or production of the labels or packaging, the manufacturer or producer was authorized to use the mark for the type of goods or packaging being made. . . .

The use of an inauthentic mark in the repackaging of genuine goods does not constitute use of a counterfeit mark if it is done without any intent to deceive or confuse as to the authenticity of the goods.

J.A. 132-33. Thus, Defendants' proposed instruction on the definition of "counterfeit" included both the authorized use and repackaging exceptions.

Noting that a material alteration instruction had not previously been given in a criminal trademark counterfeiting case, the district court expressly rejected the government's proposed instruction. Instead, the court elected to use the model instruction set out in 3 Hon. Leonard B. Sand et al., Modern Federal Jury Instructions, Instruction 54A-4. In comments on the model instruction, Sand states that "[f]urther instruction may be required when the prosecution involves goods other than the typical knock-off containing a false label." Sand, *supra*.

Emphasizing that the parties agreed that this was not the typical "knock-off" case, at the conclusion of evidence, the government renewed its request that the court instruct the jury on the material alteration theory. J.A. 2350. Although the government and Defendants agreed that the Sand instruction

was inadequate, they could not agree on how it should be modified. Rather than choosing between the government's and Defendants' proposed instructions, the district court modified the Sand instruction by quoting Section 2320's authorized use exception, instructing the jury, in pertinent part:

> A counterfeit mark is one that is identical to or substantially indistinguishable from a registered trademark, the use of which is likely to confuse, cause mistake or deceive the public in general . . . .

> I instruct you that as a matter of law, the counterfeiting statute in this case . . . does not criminalize any mark or designation used in . . . connection with goods or services . . . if the manufacturer or producer was at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced.

J.A. 2424, 2427-28. Although it quoted the authorized use exception, the district court did not quote or paraphrase the repackaging exception.

## II.

With this background in mind, turn with me to Defendant Zhao's conviction on Count 8, which covered four network routers bearing Cisco trademarks sold by JDC.

Defendant Zhao contends her conviction must be reversed because the evidence adduced by the government would only be sufficient to support a trademark counterfeiting conviction under the government's errant material alteration theory, which she contends that the government impermissibly argued to the jury. In particular, Defendants note that after the district court had instructed the jury and despite the fact that the court had rejected the government's proposed material

alteration instruction, the government still argued in its closing that altering and then reselling a genuine good constitutes illegal trademark counterfeiting for purposes of Section 2320.

For example, during its initial closing argument, the government argued that Defendants engaged in

> illegal upgrading . . . . If they were just buying things in China and selling in the U.S., they could have done that. But they were upgrading them. They were changing them. They were making them new products.

J.A. 2481. Similarly, during its rebuttal argument, the government defined "counterfeit" as follows:

> [Defendants] were taking one product and converting it to another. They were making a product in Chantilly, Virginia. That's not a Cisco product any more. Cisco has standards for its products, quality control. What they did is they took software . . . to change what those products did. They don't know what they actually could do with that software. Maybe it turned it into something unusable. They took that risk and then they packaged it up with a Cisco logo on it and sold it. That's counterfeit. Those are not Cisco products. Once you make that alteration, it's something different.

J.A. 2546. This argument, referred to hereafter as the "alteration theory," was even broader than the material alteration theory advanced in the government's proposed jury instruction because it suggested that any alteration, no matter how minor, to a product manufactured by or for a mark holder and sold under the original mark violates Section 2320.

A.

Before reaching Defendant Zhao's argument that these remarks constitute reversible error, it is first necessary to

address whether this issue is properly before us on appeal. Although not disputing the merits of this argument, the majority maintains that Defendant Zhao waived any argument regarding the government's remarks because she did not timely object below and failed to adequately raise the issue on appeal. I disagree.

At the outset, it is worth noting that the general rule is that the government "waives waiver" by failing to argue on appeal that the defendant did not preserve a given argument. *See, e.g., United States v. Quiroz*, 22 F.3d 489, 491 (2d Cir. 1994); *United States v. Beckham*, 968 F.2d 47, 54 n.5 (D.C. Cir. 1991). Here, the government did not argue in its briefs or at oral argument that Defendants waived any challenge to the government's closing remarks by failing to contemporaneously object. Appropriately, the same degree of scrutiny for preserving issues on appeal should be applied to the government as the majority seeks to apply to Defendants. If done so here, then we must conclude that the government waived the waiver argument advanced by the majority.

Nonetheless, regarding whether Defendant Zhao preserved this issue below, the majority correctly notes that the general rule is that "counsel for the defense cannot . . . remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238-39 (1940). An appellate court, however, may consider improper remarks by counsel in "exceptional circumstances" such as if the remarks were "obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 239 (quotation omitted). This Court has indicated that exceptional circumstances exist when comments by the prosecution cause "actual prejudice" to a defendant. *United States v. Elmore*, 423 F.2d 775, 780 (4th Cir. 1970).

Additionally, this Court has held that motions in limine "preserve issues that they raise without any need for renewed

objections at trial, just so long as the movant has clearly identified the ruling sought and the court has ruled upon it." *United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996). For example, we have held that when a party moves in limine to exclude evidence, the party need not renew its objection when evidence within the scope of the motion is introduced at trial. *United States v. Ruhe*, 191 F.3d 376, 383 n.4 (4th Cir. 1999); *see also* Fed. R. Evid. 103(b). Although we have not previously had occasion to apply this rule in the context of motions in limine to preclude the jury from considering a particular legal theory, the same logic applies: Because counsel is restricted to arguing the law in accordance with the principles espoused in the court's instructions, *United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1993), if a party moves in limine to bar the jury from considering a particular legal theory and the court rules on that motion, it need not renew its objection when the opposing party argues the legal theory at trial, *see Lacy v. CSX Transp. Inc.*, 520 S.E.2d 418, 427 (W. Va. 1999) ("[T]o preserve error with respect to closing arguments by an opponent, a party need not contemporaneously object where the party previously objected to the trial court's in limine ruling permitting such argument, and the argument subsequently pursued by the opponent reasonably falls within the scope afforded by the court's ruling.").

The majority contends that *Lacy* is inapposite because in that case the party's motion in limine to preclude the jury from considering a particular legal theory was *unsuccessful*, whereas here Defendant Zhao's motion in limine seeking to exclude the material alteration theory was *successful*. But it is paradoxical to argue that a party need not contemporaneously object when an opposing party argues a legal theory that was explicitly accepted by the court but must contemporaneously object—at risk of waiver—when an opposing party argues a legal theory that was explicitly rejected by the court. Such a holding would unfairly reward parties that violate a court's in limine rulings and is contrary to the policy underlying motions in limine, which is to allow a party to exclude from

consideration of the jury a prejudicial matter without drawing attention to the matter by having to contemporaneously object to it. *See* Jeffrey F. Ghent, Annotation, *Modern Status of Rules as to Use of Motion In Limine or Similar Preliminary Motion to Secure Exclusion of Prejudicial Evidence or Reference to Prejudicial Matters*, 63 A.L.R.3d 311 § 1(a) (1975).

Here, Defendants did not contemporaneously object to the government's statements during its closing. At the same time, Defendants did not "remain silent" or "interpose no objections" to the government's efforts to get the material alteration theory before the jury. Rather, Defendants repeatedly sought to bar the jury from considering the theory: on two occasions Defendants successfully asked the district court to exclude the government's proposed material alteration instruction; after the government completed its case in chief, Defendant Cone sought to have the trademarking counterfeiting counts dismissed on grounds that the alteration theory is not supported by the plain language of Section 2320; during their closing argument, Defendants sought to diminish the prejudice from the prosecution's statements by arguing that the alteration theory espoused in the government's closing was contrary to the court's instruction; and, after the jury rendered its verdict, Defendants sought to have their convictions set aside on grounds that the government impermissibly argued the alteration theory to the jury. Because the government's alteration theory was within the scope of Defendants' motion in limine, which the court definitively ruled upon prior to closing arguments, it was unnecessary for Defendants to renew their objection to the theory when, contrary to the court's ruling, the government argued the errant theory to the jury.

The majority maintains that Defendant Zhao's post-verdict motion for acquittal does not argue that the government's closing remarks regarding the material alteration theory were improper and a basis for acquittal. To the contrary, as her brief notes, Appellant's R. Br. at 12, Defendant's Zhao's motion explicitly incorporated all arguments made by Defen-

dant Cone regarding the criminal trademark counterfeiting counts in his motion for acquittal. J.A. 2698. And Defendant Cone's motion for acquittal states:

> The government argued, and the jury considered, the theory that Mr. Cone agreed to materially alter Cisco-manufactured equipment, and that this activity constitutes a violation of § 2320. Because the jury considered an impermissible basis for liability under § 2320 and the Court is unable to determine the basis for the jury's guilty verdict, Mr. Cone must be granted a new trial pursuant to Rule 33.

J.A. 2748-49. Thus, Defendant Zhao did argue in her motion for post-verdict relief that the government's closing remarks constituted a basis for her acquittal.

But even if Defendants' repeated efforts to preclude the jury from considering the alteration theory were inadequate to preserve the issue, I believe that this is one of those few cases where exceptional circumstances warrant consideration of the government's remarks on appeal. The government's remarks caused Defendant Zhao actual prejudice because they misled the jury into believing that *any* alteration of a good manufactured by or for a mark holder would be sufficient, by itself, to support a conviction under Section 2320. Yet the majority correctly holds that modifying a genuine good, without modifying the mark on the good, does not run afoul of Section 2320. *Ante* at 14. Thus, at a minimum, Defendants were prejudiced by the government's comments because they may have led the jury to incorrectly believe that Defendants could be convicted for modifying a genuine product even if the jury found that Defendants did not alter the mark on the product. *See United States v. Mitchell*, 1 F.3d 235, 241 (4th Cir. 1993) (holding that prosecution's appeal to improper legal theory during closing argument constitutes prejudicial plain error); *United States v. Chong Lam*, 677 F.3d 190, 212 (4th Cir. 2012) (Floyd, J., dissenting) (stating that a "misstate[ment of]

the relevant legal standard" by the prosecution during closing arguments is prejudicial).

The majority also contends that Defendant Zhao failed to adequately raise this issue on appeal, arguing that Zhao has never "raise[d] a claim of error under the material alteration theory as to Count 8" and never argued that the government's closing remarks constitute reversible error. *Ante*, at 30. But the majority's position is belied by Defendant Zhao's briefs.

First, after arguing at length that this Court should reject the government's material alteration theory by adopting a narrower interpretation of Section 2320, Defendant Zhao's brief states:

> If the Court adopts the narrower interpretation of Section 2320 that the plain language and the rule of lenity require, two conclusions follow. First, the government failed to prove that Zhao trafficked in counterfeit goods (as charged in Counts 8, 9, and 10). Those convictions therefore must be reversed, as must the associated money laundering convictions (Counts 27, 28, and 29).

Appellants' Br. at 36. Moreover, during her discussion of Count 8 in particular, Defendant Zhao asserts that the government's "evidence showed, at most . . . that a serial number programmed inside a genuine Cisco product was *altered* by someone." Appellants' Br. at 37 (emphasis added). Thus, Defendant Zhao repeatedly contended that the government's errant alteration theory improperly tainted her conviction on Count 8.*

---

*The majority also suggests the Defendant Zhao waived any argument that the alteration theory tainted her conviction on Count 8, when at oral argument her counsel said that the alteration theory "most clearly" impacted Count 1 and Count 9. *Ante*, at 30. But this comment cannot reasonably be interpreted as unambiguously waiving any argument that the

Second, Defendant Zhao's opening and reply briefs also repeatedly take issue with the government's closing remarks, referencing them on at least five occasions. Appellants' Br. at 20-21, 28, 32-33, 39-41; Appellants' R. Br. at 18-19. In particular, Defendant Zhao summarizes her argument as follows:

> The district court rejected the government's unprecedented [material alteration] instruction. But the court permitted the government to argue a version of the legal theory to the jury, and it denied appellants' motions challenging the theory and the verdicts that resulted. The district court's instructional ruling and its acceptance of the jury's verdicts cannot be reconciled.

Appellants' Br. at 20-21. Therefore, Defendant Zhao unambiguously argued in her opening brief that the government's closing remarks regarding the alteration theory improperly tainted the jury's verdict.

In sum, Defendant Zhao repeatedly argued below and on appeal that both the material alteration theory and the broader alteration theory tainted her trademark counterfeiting convictions because the government improperly argued the theories to the jury. Indeed, Defendant Zhao's challenges to the alteration theory were and are the central issue in this case. The government has repeatedly had the opportunity to respond to Defendant Zhao's objections on the issue, and in each case has argued that the theory is correct and thus her convictions must be affirmed. The majority correctly rejects the government's arguments and vacates or modifies all of Defendant

theory tainted her conviction on Count 8. And the majority fails to cite any authority, nor have I been able to find any, supporting the proposition that an appellant can waive an issue through an ambiguous statement made during oral argument, when the issue was raised in the appellant's briefs, as is the case here.

Zhao's convictions that were potentially impacted by the government's errant alteration theory, except for Count 8. Given the centrality of this issue to Defendant's prosecution and her repeated efforts below and on appeal to raise the issue-regardless of how inartful they may have been—whether the government's argument of the alteration theory during its closing constitutes a basis for vacating Defendant Zhao's conviction on Count 8 is properly before us on appeal.

B.

Having established that the government's comments during closing argument are properly before this Court, turn with me now to the issue of whether these comments warrant reversing Defendant Zhao's conviction on Count 8.

It is axiomatic that questions of law are the province of the court, whereas issues of fact are reserved for the jury. *Georgia v. Brailsford*, 3 U.S. 1, 4 (1794). When underlying legal principles are "undisputed," counsel is entitled to comment on the law to the jury. *United States v. Sawyer*, 443 F.2d 712, 714 (D.C. Cir. 1971). But if "counsel's view of the applicable law differs from that of the court, then . . . the jury should hear a single statement of law, from the court and not from counsel." *Id.* Consequently, "[i]n arguing the law to the jury, counsel is confined to principles that will later be incorporated and charged to the jury." *Trujillo*, 714 F.2d at 106.

Although noting that a prosecutor's instruction on the law during closing arguments lacks "the same force as an instruction from the court," the Supreme Court has recognized that "prosecutorial misrepresentations may . . . have a decisive effect on the jury" and thus can warrant reversing a conviction. *Boyde v. California*, 494 U.S. 370, 384-85 (1990). Consequently, the Supreme Court has admonished the government to abstain from securing convictions by misrepresenting facts or the law:

The United States Attorney . . . may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935); *see also Boyde*, 494 U.S. at 384.

A prosecutor's comments constitute reversible error if they were "(1) improper and (2) prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *Chong Lam*, 677 F.3d at 203 (quotation omitted). This Court considers six factors in determining whether a prosecutor's comments prejudiced a defendant's "substantial rights":

(1) the degree to which the prosecutor's remarks ha[d] a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. We also consider (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel, and (6) whether curative instructions were given to the jury.

*United States v. Lighty*, 616 F.3d 321, 361 (4th Cir. 2010). In cases in which a prosecutor erroneously instructs the jury on the law, "[t]he determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *United States v. Holmes*, 406 F.3d 337, 356 (5th Cir. 2005) (citation omitted).

## C.

Applying this framework to the case at hand, we first must determine whether the government's remarks were improper. *Chong Lam*, 607 F.3d at 203. In light of our conclusion that the alteration theory advanced by the government is not cognizable under Section 2320, the government's closing remarks were an incorrect statement of the law, and thus improper. *Mitchell*, 1 F.3d at 242 (holding that prosecutor's appeal to improper legal theory during closing argument constituted plain error). The remarks also were improper because the government is restricted to arguing legal principles included in the jury charge, *Trujillo*, 714 F.2d at 106, and the district court had repeatedly sustained Defendants' motions objecting to the material alteration instruction.

The key issue, then, is whether, under the six *Lighty* factors, the government's comments prejudiced Defendants' substantial rights. Here, all of the *Lighty* factors support reversing Defendant Zhao's conviction on Count 8. Regarding the first factor, as I explained previously, the government's remarks misled the jury and prejudiced Defendant Zhao because they incorrectly suggested that she could be convicted for modifying a genuine product even if the jury found that she did not alter the mark on the product. *See United States v. Mandel*, 862 F.2d 1067, 1073 (4th Cir. 1988) ("[W]e hold that in a case in which the jury considers alternate theories of liability, we must reverse the convictions if either theory is an improper basis for punishment.").

Relatedly, based on the evidence adduced at trial, it is unclear whether there was sufficient competent evidence to convict Defendants on Count 8, as is required by the third *Lighty* factor. In particular, the government and Defendant Zhao presented conflicting evidence regarding whether the routers were manufactured by or for Cisco. At trial, a Cisco employee described the routers as "counterfeit" for two reasons: (1) they had codes on them that Cisco had assigned to

routers with more ports and (2) the packaging for the routers was not Cisco packaging because it included a number of spelling errors. By contrast, an expert witness testifying on behalf of Defendants said that certain unalterable codes "burned into" the routers' memory indicated that they were manufactured by or for Cisco. J.A. 2207 And the Cisco employee called by the government testified that he did not know whether the routers were manufactured by or for Cisco.

As the majority correctly holds, evidence that a product has been repackaged is not, by itself, sufficient to prove that the product is nongenuine for purposes of Section 2320. *Ante*, at 24; *see also Hanafy*, 302 F.3d at 489. Moreover, based on the government's closing statement, the jury may have erroneously believed that any alteration of a genuine product—such as changing the codes assigned to the routers—could serve as the basis for a conviction under Section 2320. Consequently, we do not know whether the jury credited the government's evidence—and thus discredited Defendants' evidence—that the routers were not manufactured by or for Cisco, and therefore we do not know whether there was sufficient competent evidence to support Defendant Zhao's conviction. *See United States v. Hastings*, 134 F.3d 235, 241 (4th Cir. 1998) (holding that when a jury may have reached a verdict based on an erroneous legal theory, a reviewing court "must attempt to ascertain what evidence the jury necessarily credited in order to convict the defendant under the instructions given. If that evidence is such that the jury must have convicted the defendant on the legally adequate ground in addition to or instead of the legally inadequate ground, the conviction may be affirmed").

The second, fourth, and fifth *Lighty* factors also support vacating the conviction. In particular, the improper appeal to the alteration theory was extensive: not only did the government argue the alteration theory during its closing, the theory also played a key role in the government's opening argument. The pervasive appeal to the alteration theory throughout the trial and the government's repeated unsuccessful requests that

the district court instruct the jury on that theory also indicate that the government's remarks were deliberate. *See Chong Lam*, 677 F.3d at 212 (Floyd, J., dissenting) ("Where, however, a prosecutor continues to make an incorrect statement of the law after the district court has sustained repeated objections to that statement, notifying the prosecutor of the error, the court should, in my opinion, infer some degree of deliberateness."). Further, there is no evidence that improper conduct by the defense invited the remarks by the government. To the contrary, the defense properly sought to bar the government from arguing the theory through its successful motion in limine to prohibit the proposed instruction.

Regarding the sixth and final factor, because we presume juries follow their instructions, even in the absence of a curative instruction, a misstatement of law by counsel generally will not warrant overturning a jury verdict if the court's instruction on the issue correctly stated the controlling law and barred the jury from convicting the defendant based on the erroneous legal theory. *See, e.g.*, *Chalmers v. Mitchell*, 73 F.3d 1262, 1271 (2d Cir. 1996); *United States v. Fierro*, 38 F.3d 761, 771-72 (5th Cir. 1994). Here, the district court did not provide a curative instruction, so the key question is whether the court's instruction on the definition of "counterfeit" foreclosed the jury from deciding this case based on the government's erroneous alteration theory.

As noted previously, the district court elected to use the Sand model instruction and modified it by quoting the authorized use exception. But neither the Sand instruction nor the language of the authorized use exception explicitly addresses whether altering a product that has its genesis in authorized production constitutes trademark counterfeiting. Thus, jurors reasonably could have believed that the court's instruction did not foreclose them from finding Defendant Zhao guilty under the alteration theory improperly argued by the government. Indeed, the district court appears to have believed that its instruction did not foreclose the jury from relying on the gov-

ernment's errant alteration theory: though the court elected not to give the government's proposed material alteration instruction, the district court did embrace the theory in rejecting Defendant Cone's Rule 29 motion for acquittal. J.A. 2345 ("[T]he presentation of an item as new when it has been altered under a mark is likely to cause confusion and lead the consumer to believe the product was made by the genuine owner of the trademark in the fashion in which it left the factory even though it was not.").

Nevertheless, the government argues that the court's instruction was proper and that "the jury was in no way directed to convict if a 'material alteration' had been made." Appellee's Br. at 25-26. But, despite Defendants' request, the court refused to instruct the jury on the repackaging exception because the court did not want to embrace a novel legal theory in its instruction. Given the centrality of the alteration theory to the government's case, the best course of action would have been for the district court to explicitly address the theory in its instructions—as, with the benefit of our holding in this case, future courts should do. At the least, it was incumbent on the court to instruct the jury on *all* statutory provisions addressing when resale of genuine products can give rise to trademark counterfeiting liability, which it did not do.

In sum, the majority of the *Lighty* factors favor vacating Defendant Zhao's conviction on Count 8. Moreover, the government's uncontradicted alteration argument casts significant doubt on the correctness of the jury's verdict by making it impossible for us to determine whether the jury properly credited the government's evidence or improperly credited the government's errant legal theory—although the jury's conviction of Defendant Zhao on Count 9, when the government conceded that the product at issue was manufactured by or for Cisco, suggests the jury improperly was doing the latter rather than correctly doing the former.

### III.

In addition to disagreeing with the majority's decision to affirm Defendant Zhao's conviction on Count 8, I write separately to highlight two important points not explicitly addressed by the majority.

First, it is important to clarify that in resentencing Defendants on their conspiracy convictions under the majority's decision, the district court must not factor into the revised sentences evidence presented at trial that Defendants' upgraded and resold genuine Cisco PIX firewalls. Sales of the upgraded PIX firewalls constituted a substantial portion of JDC's sales, exceeding $1,200,000, and therefore factored into Defendants' sentences. As was the case with the router at issue in Count 9, the government concedes that the PIX firewalls were originally manufactured by or for Cisco. Yet under this Court's holding, merely upgrading a genuine product does not give rise to liability under Section 2320. Therefore, Defendants cannot be punished for trademark counterfeiting related to the PIX firewalls, and their sentences should be modified accordingly.

Second, it should be emphasized that we were not tasked with addressing whether a defendant violates Section 2320 by repackaging a genuine but modified good in a non-deceptive manner. According to the majority, a defendant cannot be held criminally liable under Section 2320(a) for "obtain[ing] a genuine . . . product bearing a genuine mark; modif[ying] the product, but not the mark; then s[elling] the modified product bearing the genuine mark." *Ante*, at 14. Although this is a correct statement of law, it should not be read as holding that a defendant who alters a genuine product *and* simultaneously alters an associated mark or packaging *always* violates Section 2320 as a matter of law.

Here, the government did not argue below and does not argue on appeal that the coincidence of altering a genuine

product and altering an associated mark gives rise to liability under Section 2320. Rather, the government consistently has argued that altering a genuine product by itself is sufficient to turn the genuine product into a counterfeit—an argument that we reject. Moreover, the government did not introduce evidence that Defendants altered the marks associated with the Cisco products they upgraded. Consequently, we were not tasked with resolving—and therefore did not answer—whether nondeceptively repackaging an altered, genuine product constitutes criminal trademark counterfeiting.

The district court held that as a matter of law altering and then repackaging a genuine good is inherently deceptive. J.A. 2345. But the Fifth Circuit has rejected the argument that the repackaging of genuine goods causes confusion as a matter of law. *Hanafy*, 302 F.3d at 488. And one can easily envision scenarios in which a defendant nondeceptively alters and resells a genuine product. For example, presumably a computer store can upgrade software on a Cisco router and sell it as "Cisco router with upgraded software" without running afoul of the statute. Therefore, whether the repackaging of an altered product constitutes trademark counterfeiting remains an open question and must be answered on a case-by-case basis.

## IV.

In sum, although the majority properly rejected the government's material alteration theory of trademark counterfeiting, it improperly affirmed one of Defendant Zhao's substantive trademark counterfeiting convictions that was tainted by a version of that theory. Therefore, I respectfully dissent.